*124 OPINION.
Lansdon:
This appeal has been argued by the taxpayer upon the assumption that a decision favorable to the taxpayer with reference to the small deficiencies for the years 1918 and 1919 would influence the Commissioner to grant refunds involving some $25,000 with reference to taxes paid for the years 1916 and 1917, which years involve the same facts as are presented by this appeal. Because of the importance of the matter from the taxpayer’s standpoint, we deem it desirable to state the reasons for our decision irrespective of the small amount involved in the deficiencies which are the basis for this ajipeal.
The single question raised by this appeal is whether the taxpayer shall, six years after the latest taxable year involved, be permitted to reconstruct its capital account as to drawings and patterns so as to now theoretically deduct depreciation for the years 1916 to 1919, inclusive, with the resulting reduction in its taxable income for those years and increase in its invested capital for the years 1917 to 1919, inclusive. Upon the authority of Appeal of The Sneath Glass Co. 1 B. T. A. 736, such a procedure should not be permitted.
It is apparent from our findings of fact that the taxpayer was continually revising and changing its accounting system as to depreciation in order to gain the most benefit apparent at the time. So far as that was a consistent policy it has been followed to the present appeal. From the standpoint of the taxpayer that policy has been one of conservatism throughout its history. In 1908 it took over drawings and patterns which had been used in its predecessor’s business for possibly six years. It took them at cost to its predecessor. It was reasonable immediately to charge oif 75 per cent of that cost for' second-hand assets of doubtful value and uncertain life for usefulness. Such drawings and patterns as the taxpayer made in 1909 it charged directly to operating expense, a conservative treatment and unquestionably done under the belief that the additions were used up in manufacturing of that year.
In November, 1909, it charged back upon its books one-half of the 1908 charge-off. It left those capital amounts undisturbed upon its books until June 30, 1916, being contented during each year of the interim to charge off only the cost of annual additions to drawings and patterns.
*125 But its business increased by leaps and bounds in 1916, going from a gross business in 1915 of less than $300,000 to a total for 1916 of about $800,000. It then brought to light a drawings account of $43,286.46 which it 'accumulated by the addition of expense which had been charged off from 1908 on, and against that it applied a depreciation rate of 55 per cent for 1916. . Similar treatment was applied to patterns. The net income for that year was thereby conservatively reduced by some $26,000, in addition to $17,000 expense for 1916 drawings and patterns charged directly against the year’s earnings. The 50 per cent charge-off of December 31, 1916, was carefully accompanied by the notation “Discarded as superseded, patterns destroyed.”
Then appears the first Excess Profits Tax Act of March 3, 1917, and on June 30, 1917, the taxpayer set up a depreciation reserve as of December 30, 1916, continued to charge off 1917 additions .within the year, and at the end of the year further depreciated by 50 per cent the remaining balance of drawings and patterns as the same (with some discrepancies) stood upon its books. In 1917 its.gross income was over $600,000, in 1918 upward of $850,000. During 1918 it applied a 25 per' cent depreciation rate to the balance of the drawing and pattern account; during 1919, a 10 per cent rate. In the face of having so expressed its belief in the shortness of useful life of its patterns and drawings, the taxpayer now seeks to reverse its action over the 11 years in question and to justify a life of 10 years for its drawings and patterns on the basis of 1908 cost and additions.
We observe that after the fire in January, 1910, when all of the taxpayer’s patterns were destroyed, a gross business was done for that year of over $300,000, or an increase over 1900 of $170,000, and yet the taxpayer shows expense of patterns for that year of less than $6,000, which convinces us that' the patterns acquired from the Aluminum Press Co., and probably the drawings as well, were not of the urgent necessity in the business which the taxpayer would now have us believe. That fact, together with the taxpayer’s treatment of the matter over all the years from 1908 to 1919, inclusive, forces us to the conclusion that the conservative action repeatedly taken by the taxpayer during those years was fully justified.
If further evidence were required, we merely observe that the $54,000 of drawings acquired in 1908 must have been constructed’ during the years going back to 1902, and, even on an average age of 10 years dating from 1905, would have been entirely exhausted by January 1, 1916, upon the taxpayer’s own claim as to their period of usefulness.
So far as the patterns which were constructed after the 1910 fire are concerned, we are not convinced that the conservative treatment by the taxpayer, which was approved by the Commissioner, should *126 be disturbed as an unreasonable allowance for depreciation in the years during which the deductions were in fact made.
As to such questionable matters as drawings and patterns — that is, whether they are deductible expenses or capital expenditures, and the period of their usefulness, if the latter — when a taxpayer has once acted reasonably with sound and conservative business judgment that meets with the approval of the Commissioner at the time, such action should not be reversed when the sole reason therefor is the apparent purpose of later reducing taxes otherwise assessable.